IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANDREW ALAN BOGATS** and | ) | |
| **TAMMY LYN BOGATS**, his wife, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:18cv708 |
| | ) | Electronic Filing |
| **STATE FARM MUTUAL AUTOMOBILE** | ) | |
| **INSURANCE COMPANY**, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Andrew Alan ("Andrew") and Tammy Lyn ("Tammy") Bogats ("plaintiffs") commenced this action against their automobile insurer, State Farm Mutual Automobile Insurance Company ("defendant" or "State Farm") for unpaid insurance benefits and bad faith insurance practices. Presently before the court is defendant's motion for summary judgment on plaintiff's bad faith claim. For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted. Anderson, 477 U.S. at 249-50;

2

see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992),

cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or

competing inferences, it is no longer required to "turn a blind eye" to the weight of the

evidence).

      The record as read in the light most favorable to plaintiffs establishes the background

set forth below.  On or about January 24, 2013, Andrew was involved in a rear-end motor

vehicle accident and sustained various injuries, including injuries to his head, neck, shoulders,

and back.  He reported the accident to defendant the next day.

      The other driver who rear-ended Andrew, Mr. Bane, also was insured by State Farm.

He had liability coverage of $15,000.00 per person with a $30,000.00 per accident limit.

      On April 29, 2013, plaintiffs submitted an application for benefits to State Farm.  As

part of that application plaintiffs were asked to "[d]escribe automobiles owned by you or any

member of your family residing in the same household."  They listed the following vehicles:

- 2007 Yukon, owned by Tammy and insured with State Farm;

- 1996 Mercedes, owned by Andrew and insured with  State Farm;

- 2002 Ford Explorer, owned by Andrew and insured with State Farm; and

- 1999 Dodge Ram, owned by Andrew and insured with State Farm.

Plaintiffs did not identify any other vehicles in the application for benefits.

      Between February of 2013 and September of 2014, Andrew treated with various

medical providers and State Farm paid the corresponding medical bills.  Throughout this time

plaintiffs requested information regarding the providers and the amount of benefits paid, copies

of various invoices, and other information regarding the medical treatment Andrew was

receiving.  State Farm promptly responded to plaintiffs' requests.

On or about September 18, 2014, plaintiffs requested that an underinsured motorist ("UIM") claim be opened.  The next day, State Farm UIM Claim Specialist Marshall Billig reviewed a household search for plaintiffs' home address at "39 Noble Avenue, Pittsburgh, PA 15205."  The report showed there were four vehicles in plaintiffs' household.  Those four vehicles matched the four vehicles identified by Andrew in his Application for Benefits.  The report did not show any other household vehicles or policies associated with the Noble Avenue address.

The four vehicles were on a "stacking" policy that provided $15,000.00 per person in UIM coverage for a total of up to $60,000.00.  After receiving that information, Mr. Billig directly informed plaintiffs of the $60,000.00 UIM limit.  He then sent written correspondence to plaintiffs on September 22, 2014, reiterating that State Farm had found applicable "stacked" coverage for four vehicles in plaintiffs' household: a 2002 Ford Explorer, a 1999 Dodge Ram 1500, a 2007 GMC Yukon XL, and a 1996 Mercedes S420.  Plaintiffs were directed to raise or present any questions about "this applicable household coverage or . . . the number of vehicles in the household" and, if they had such questions, to complete and return an affidavit of uninsured/underinsured coverage that had been included with the correspondence.  Plaintiffs did not respond with questions or return the affidavit.

On November 3, 2014, Andrew e-mailed Billig and a bodily injury claim specialist, Nicole Moran, and demanded $15,000.00 to settle his bodily injury claim and "no less than" $15,000.00 to settle the UIM claim.  The next day, Billig reviewed the records in State Farm's possession and then informed Andrew that based on the current documents in State Farm's possession, it was his impression that the case did not have a value in excess of the liability limits.  Billig further indicated that if there were additional documents, he would be willing to review them and re-evaluate the claim.

4

On November 6, 2014, Billig sent a letter to Andrew reiterating his assessment that the value of plaintiffs' claim did not exceed the underlying bodily injury limits, but further indicating that he would make a compromise offer to resolve plaintiffs' UIM claim.   Further negotiation between the two ensued and on January 16, 2015, plaintiffs accepted $4,000.00 to resolve their UIM claim.

On June 16, 2015, Andrew contacted State Farm and explained that he was still in pain and was still treating with medical providers.  A claim specialist informed him that he was still able to submit further treatment documentation in support of a re-evaluation or potential re-valuation of the claim.

On July 28, 2015, Andrew notified State Farm that he had undergone an MRI which revealed a herniated disc and surgery was being recommended.  State Farm requested that plaintiffs submit documentation of expenses for further evaluation.  The next day, Claim Specialist Corey Allerton followed up with written correspondence, again requesting that plaintiffs keep State Farm advised of Andrew's treatment going forward.

On July 31, 2015, Allerton spoke with Andrew about his MRI and requested that he provide medical authorizations so State Farm could obtain the records directly from the provider.  Allerton forwarded the authorizations to Andrew for signature that same day. Andrew did not respond.

On August 18, 2015, Allerton again spoke with Andrew regarding his medical conditions and inquired whether he had received the medical authorizations forwarded for signature.  Andrew stated that State Farm did not need authorizations and demanded the remaining UIM policy limits of $56,000.00.  He insisted that State Farm respond to his demand by August 21, 2015, and rejected Allerton's request for an additional week or two to evaluate the new demand.

On August 20, 2015, plaintiffs' UIM claim was referred to Attorney Thomas McDonnell in order to obtain a Statement Under Oath ("SUO") in furtherance of investigating the claim. Andrew was informed of the referral. It further was explained that after a review of the file State Farm was requesting the SUO regarding Andrew's injuries. The next day, Allerton called Andrew. Andrew resisted the idea of giving a SUO.

On September 19, 2015, Allerton spoke with Andrew regarding the status of his claim. He explained that Attorney McDonnell was attempting to secure a SUO and noted that as of that time Andrew had declined to provide the statement. Andrew again declined to provide the SUO.

On September 30, 2015, Claim Team Manager Bradley Blaha and Allerton conferred regarding plaintiffs' UIM claim. They discussed Andrew's July 30, 2015, MRI and the subsequent surgery recommendation, and then noted that Andrew had not yet undergone the surgery. State Farm decided to offer plaintiffs $50,000.00 to resolve the UIM claim.

In October of 2015, plaintiffs accepted the $50,000.00 to resolve the UIM claim.

On November 9, 2015, Plaintiff e-mailed Attorney McDonnell and expressed concern about the amount of coverage he had available. For the first time, Andrew indicated that his stepson, Troy Burke, resided with him and Tammy and Burke had a vehicle insured with State Farm. This was the first time plaintiffs had informed State Farm that they had a stepson who owned a vehicle that was insured with State Farm.

On November 18, 2015, Andrew e-mailed Attorney McDonnell with the contact information for insurance agent Pamela Broadhead, who was the agent that had procured a State Farm insurance policy for Burke.

On November 19, 2015, Allerton contacted Broadhead. She confirmed the existence of Burke's policy, but further advised that Burke lived at 9091 Timberglen Drive, Imperial, PA

15126, which is an address different than plaintiffs' residence at 39 Noble Avenue, Pittsburgh, PA.

On November 20, 2015, Attorney McDonnell sent a letter to Andrew explaining that Burke's policy had a different address and last name than the Bogats'. McDonnell explained that because of the different address and last name, Burke's policy would not have appeared on a household inquiry for 39 Noble Avenue. McDonnell stated that if Burke was not residing with plaintiffs, then there would be no UIM coverage under his policy.

On November 23, 2015, Andrew e-mailed McDonnell and explained that Burke had always lived with him and his wife, and the address on Burke's policy was Burke's father's address. Andrew further indicated "[Mr. Burke's] father set Troy up with his agent and most likely listed his address for billing so I am assuming this is where the information is being misconstrued."

On December 7, 2015, State Farm requested the application for Burke's policy from underwriting. On December 31, 2015, Attorney McDonnell sent a copy of the application to plaintiffs for review. The underwriting documents from Burke's policy reflected his address as 9091 Timberglen Drive, Imperial, PA 15126.

On January 10, 2016, Andrew e-mailed Attorney McDonnell and acknowledged receipt of the underwriting documents. Andrew demanded $43,000.00 to resolve the UIM claim.

On January 15, 2016, Allerton started the process for setting up a claim under Burke's policy.

On February 12, 2016, Andrew spoke with Blaha, and again declined to appear for a SUO. Andrew advised that Broadhead had information regarding Burke's residency with plaintiffs. Blaha indicated he would speak with Broadhead, and that State Farm would like to resolve Burke's residency without the need for a SUO on that issue. Blaha further clarified that

a SUO would still be needed in conjunction with Andrew's injuries.  That same day, Blaha

spoke with Broadhead, who related the following timeline in her handling of Burke's

insurance:

- At the time Burke turned 16 years of age, Burke's father had Burke listed as a driver under his policy;

- Broadhead assumed that Burke lived with his father, and was never told otherwise;

- On November 12, 2009, Burke got a policy issued to him alone;

- On July 6, 2011, Burke replaced his Ford Explorer with an Oldsmobile Cutlass;

- On April 17, 2014, Burke replaced his Cutlass with a Hyundai Elantra.  There was no request for a change of address and Broadhead had no reason to believe that Burke did not live at his father's residence, which was listed on the master policy;

- On December 10, 2015, (after plaintiffs notified State Farm of the existence of Burke's policy) Burke sent a fax to State Farm and requested his address be changed retroactively to plaintiffs' Noble Avenue address;

- On December 12, 2015, Tammy called Broadhead and requested that Burke's address on his policy be changed to plaintiffs' Noble Avenue address, retroactive to 2009.  Broadhead indicated Burke personally would have to request such a change; and

- On January 4, 2016, Burke requested a change of address to plaintiffs' Noble Avenue address, retroactive to 2009.  Broadhead indicated that there might be a charge included with making the address retroactive, at which point Burke said to just make the change effective on that day, January 4, 2016.

On February 15, 2016, plaintiffs were notified that State Farm's investigation of Burke's

policy was complete, and there was $100,000.00 in coverage available under that policy.  State

Farm reiterated its request for a SUO, but indicated it would be limited to Andrew's injury

claim.

On March 3, 2016, Andrew spoke with Allerton and asked if State Farm could advise

him what coverages were still available to him.  Allerton indicated that State Farm would send

8

him a letter to that effect. Andrew then inquired as to what more State Farm needed from him to evaluate his claim. Allerton responded that State Farm still needed a SUO. Allerton then sent a letter to Andrew with the requested policy information; it identified $160,000.00 in total UIM coverage, with $50,000.00 already having been paid as of that date.

On May 12, 2016, Andrew e-mailed Attorney McDonnell and explained that he would be undergoing a pre-surgery physical on May 20, 2016. He also indicated he would be retaining counsel before his physical, and that he was giving State Farm "one last opportunity" to settle the claim.

On May 25, 2016, Attorney McDonnell sent a letter to Andrew explaining that State Farm would not be increasing the offer at that time. Attorney McDonnell reiterated State Farm's request for a SUO, and requested Andrew to forward any documentation which may change the evaluation, including records of any future surgery.

On June 16, 2016, Andrew spoke to Allerton and advised that he was giving State Farm one last chance to settle his claim prior to obtaining representation. Allerton asked if he had undergone surgery, to which Andrew responded that he had not. Andrew indicated he would not be having the surgery until he was sure he would be compensated. Allerton repeated State Farm's ongoing request for a SUO. Andrew reiterated his intent to engage counsel.

After retaining counsel, Andrew agreed to present for a SUO on September 9, 2016. At that time Andrew confirmed that he had not scheduled any surgery.

On October 14, 2016, Attorney McDonnell sent a letter to plaintiffs' counsel, asking to be updated if "Mr. Bogats' status concerning his surgery changes." McDonnell noted that he would advise State Farm that there were no additional relevant records for review, but reiterated State Farm's request to provide any further information that would impact the evaluation of the UIM claim.

On February 7, 2017, Attorney McDonnell wrote to plaintiffs' counsel indicating that it would be beneficial to have Andrew's treating physician, Dr. Baghai, provide a narrative report concerning the causal relationship between the proposed surgery and the January 24, 2013 motor vehicle accident.  McDonnell again requested to be kept informed if and when Andrew had his surgery.

On March 14, 2017, Claim Specialist Linda Cranich noted that Andrew had demanded the remaining policy limits of $110,000.00, but had not submitted any additional information or documents to support the increased demand.

In the months that followed plaintiffs retained a new attorney.  On August 7, 2017, Attorney McDonnell wrote to plaintiffs' new counsel, confirming a discussion of Andrew's claim and requesting any updated information which would impact the evaluation of it.

On September 20, 2017, State Farm decided to schedule Andrew for an independent medical examination to assist with its investigation and evaluation.  Plaintiffs filed suit soon thereafter.

On January 8, 2018, Neurosurgeon Daniel Bursick performed an Independent Medical Examination for the purpose of determining the reasonableness and necessity of Andrew's surgery, and its relatedness to the January 24, 2013 accident.   In his report, Dr. Bursick opined that, over five years after the accident, the clinical findings on Andrew's radiological films revealed "mostly mild multilevel degenerative changes.  There is no fracture.  There is no dislocation and there is nothing we can relate at this point directly to the motor vehicle accident."  He went on to opine that "[Andrew's] intermittent neck pain certainly supports the diagnosis of cervical spondylosis, but does not necessarily reflect its direct relationship to the motor vehicle accident."  Dr. Bursick indicated Andrew's prognosis was indeterminate, and noted that his other treating doctors, including Dr. Baghai, had made the same assessment.  Dr.

10

Bursick did not see any permanent or temporary impairment related to the motor vehicle accident.  He did not see any definitive medical restrictions.  And finally, Dr. Bursick questioned whether Andrew should even be a surgical candidate, and reported that "it has simply been far too long" to relate any of Andrew's current complaints to the January 24, 2013 motor vehicle accident.

When handling the adjustment of Andrew's claim and negotiating with Andrew regarding the same, State Farm was aware that Andrew was not represented by an attorney until July/August of 2016, which was after Andrew accepted the offer of $50,000 to resolve his UIM claim.

Burke resided with Andrew and Tammy at 39 Noble Avenue in Crafton, Pennsylvania, on January 24, 2013, the date when plaintiffs were involved in the motor vehicle collision with Bane.  Although Burke's policy of insurance was purchased through his father's agent, Burke had always resided with his mother and stepfather at their Noble Avenue address.  Burke had an Oldsmobile Cutlass at that time and the vehicle was registered with the Pennsylvania Department of Motor Vehicles at the Noble Avenue address.  The registered address on Burke's driver's license from the time he acquired it through the date of this collision and for a time thereafter was 39 Noble Avenue in Crafton, Pennsylvania.

State Farm had issued a policy naming Burke as an insured prior to the accident and thus had his driver's license on file.   Burke also had provided State Farm with his school transcript from the Carlynton School District showing his Noble Avenue address and identifying his mother, Tammy Bogats, as his mother.  This documentation was provided as part of the paperwork submitted to obtain a student driver discount from State Farm.  When Burke placed the Oldsmobile Cutlass on his State Farm policy, he provided State Farm with a

registration card that indicated the car was registered to Troy Burke at the Noble Avenue address.

State Farm moves for summary judgment on plaintiffs' bad faith insurance practices claim, contending it acted appropriately at all times in adjusting Andrew's UIM claim.  It notes the facts surrounding its handling of the claim are not in dispute and asserts the record reflects an objectively reasonable basis for each interaction it had with plaintiffs and the decisions it made in adjusting the claim.  Consequently, from defendant's perspective, the record fails to contain sufficient evidence to support a finding of bad faith insurance practices in violation of 42 Pa. C. S. § 8371.

Plaintiffs maintain that State Farm had a duty to disclose all available coverage to its insured in adjusting the claim and it failed to do so.  They note State Farm failed to make them aware that Burke's policy limits were available in adjusting Andrew's claim, resulting in a representation that there was only $60,000.00 in available coverage instead of the $160,000.00 that actually was available with the inclusion of Burke's policy.  Plaintiffs maintain that they relied on this misrepresentation in settling the UIM claim for $50,000.00.  And because the information made available to State Farm through various sources of information provided by Burke indicated that he lived with plaintiffs, from plaintiffs' perspective State Farm's representations as to the limits of coverage were reckless and unreasonable, resulting in an adequate foundation to support a finding of bad faith insurance practices under Pennsylvania law.

At common law there was no redress for an insurer's bad faith denial of claims under an insurance policy.  See D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co., 431 A.2d 966 (Pa. 1981).  In 1990, the Pennsylvania legislature created a statutory remedy for such conduct by enacting the "bad faith statute," codified at 42 Pa. C. S. § 8371.

To recover for a claim of bad faith under § 8371, the policy holder must show that the insurer: (1) did not have a reasonable basis for denying benefits under the policy, and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim.  Terletsky v. Prudential Property and Casualty Insurance Co., 649 A.2d 680, 689-90 (Pa. Super. 1994). Although the term "bad faith" on the part of an insurer is construed as encompassing "any frivolous or unfounded refusal to pay proceeds of a policy" and ordinarily imports "a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill-will[,]" the statue does not require a plaintiff to prove that the insurer consciously acted pursuant to such a motive or interest; it is enough if the insurer recklessly disregarded the lack of a reasonable basis in denying benefits.  Klinger v. State Farm Mutual Automobile Insurance Co., 115 F.3d 230, 233 (3d Cir. 1997) (quoting Terletsky, 649 A.2d 680, 688); accord Rancosky v. Washington Ins. Co., 170 A.3d 364, 376-77 (Pa. 2017) ("For the reasons set forth above, we conclude that the Superior Court's longstanding two-pronged test, first articulated in Terletsky, presents an appropriate framework for analyzing bad faith claims under Section 8371 . . . [and] we hold that proof of an insurer's motive of self-interest or ill-will, while potentially probative of the second prong, is not a mandatory prerequisite to bad faith recovery under Section 8371.").

Pennsylvania law defines reckless conduct as the "intentional acting or failing to act in complete disregard of a risk of harm to others which is known or should be known to be highly probable and with a conscious indifference to the consequences."  Pennsylvania's Suggested Standard Jury Instructions, at 3.17.  It has long been recognized that mere negligence in ascertaining whether a claim is covered is insufficient to support a recovery for bad faith practices.  See Polselli v. Nationwide Mutual Fire Insurance Co., 23 F.3d 747, 751 (3d Cir. 1994); Jung v. Nationwide Mutual Insurance Co., 949 F. Supp. 353, 356 (E.D. Pa. 1997).  It is

13

likewise clear that an incorrect analysis of the applicable law or a genuine uncertainty as to its application are insufficient to sustain bad faith liability. See Jung, 949 F. Supp. at 356; Terletsky, 659 A.2d at 690 (opining that where Pennsylvania law was in flux with regard to its application to the matter at hand, insurer had reasonable basis for disputing claim of coverage which precluded claim of bad faith, even though insurer was mistaken as to availability of coverage under law as clarified by appellate court); Polselli, 23 F.3d at 752 (noting that complex factual situation which created uncertainty as to application of law to facts may mitigate against finding of bad faith, as may animosity generated by the parties' treatment of each other in attempting to identify their respective rights and resolve the matter).

Actionable bad faith encompasses behavior beyond the denial of a claim without a reasonable basis and can extend to an insurer's investigation of a claim. A variety of carrier actions can constitute bad faith, including "a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 751 n. 9 (3d Cir. 1999); see also Terletsky, 649 A.2d at 688. Bad faith can also include an unreasonable delay in handling claims. See Willow Inn, Inc. v. Public Serv. Mut. Ins. Co., 399 F.3d 224, 235 (3d Cir. 2005). But an insurer's mere negligence or bad judgment is not bad faith. Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005). To defeat a claim of bad faith, an insurer must only demonstrate that it had a reasonable basis for its decision or course of action. Leach v. Nw. Mut. Ins. Co., 2005 U.S. Dist. LEXIS 39966, at * 29 (W.D. Pa. Dec. 22, 2005) aff'd, 262 F. App'x 455 (3d Cir. 2008). In other words, the inquiry "for bad faith liability is not whether the insurer is correct, but whether there exists a 'reasonable basis for denying benefits under the policy." Krisa v. Equitable Life Assur. Soc'y, 113 F. Supp. 2d 694, 703 (M.D. Pa. 2000) (quoting Keefe v. Prudential Property & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000)).

14

Each element of a bad faith claim must be established by evidence which is "clear, direct, weighty and convincing, so as to enable the [factfinder] to make its decision with a 'clear conviction.'" Polselli, 23 F.3d at 752; accord J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004) (Under the clear and convincing standard, an insured is required to show that "the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.") (quoting Bostick v. ITT Hartford Group, Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999)). Plaintiff's burden at this stage of the litigation is "commensurately high in light of the substantive evidentiary burden at trial." J.C. Penney Life Ins. Co., 393 F.3d at 367; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 ("We conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages."). Thus, an insurer's bad faith conduct may not be merely insinuated. Terletsky, 649 A.2d at 688.[1]

Here, the record falls short of establishing the essential requirements of a bad faith insurance practice claim by clear, direct, weighty, and convincing evidence. Polselli, 23 F.3d at 752. The matter presented to defendant and this court falls far short on the showing needed to permit the finder of fact to arrive at a finding of bad faith. Plaintiffs efforts to establish otherwise amount to a mere insinuation that State Farm could have been more astute in scrutinizing the information provided by Burke and his father and had it done so and

---

[1] Nevertheless, if a reasonable jury could find that the carrier did not have a reasonable basis for denying benefits under the policy and knew of or recklessly disregarded this, summary judgment is not appropriate. Jung, 949 F. Supp. at 355-56.

questioned Burke about the inconsistency between the documentation he provided and the policy address he and his father had utilized in establishing the policy and paying the ongoing premiums, State Farm would have and should have detected that Burke lived with plaintiffs.  In turn, uncovering this would have resulted in the inclusion of Burke as a family member with a State Farm policy who also resided at the Noble Avenue address; and the inclusion of Burke's policy limits in UIM coverage being made available at an earlier time in the claim adjustment process.

But State Farm's failure to uncover the availability of Burke's policy and add it to the coverage available for Andrew's UIM claim amounts at best to a showing of negligence.  And more to the point, plaintiffs' efforts to convert the information provided by Burke and his father during the underwriting process and by Burke in updating information for policy discounts and vehicle coverage into an unfounded and unreasonable basis for failing to detect Burke's actual residence is nothing more than an attempt to insinuate an evidentiary basis for a finding of bad faith.  Plaintiffs have not identified any procedure which State Farm failed to follow in maintaining Burke's policy address at Timberglen Drive as requested by the insured(s).  Plaintiffs have failed to cite evidence of any internal practice of scrutinizing an insured's actual motor vehicle documentation for verification that the insured's policy address has changed.  Plaintiffs have not come forward with evidence that it is routine to update the address listed on a policy based on anecdotal information during a policy change.  And they have failed to identify any effort by State Farm to avoid investigating Burke's actual address and adjusting the claim once it was made known that Burke resided at Noble Avenue and not Timberglen Drive.

Moreover, State Farm repeatedly considered Andrew's multiple requests for reevaluating the amount of UIM coverage available even though plaintiffs seemingly had

16

settled the claim.  It is undisputed that it made the additional coverage under Burke's policy available to plaintiffs without meaningful delay once Burke's actual address at Noble Avenue was made known to State Farm and it verified the same.

Against this backdrop it is rank speculation to infer that the State Farm principals involved here engaged in a course of conduct with the intent to promote State Farms' financial interest over its fiduciary obligations to plaintiffs, or that they recklessly pursued a course of conduct that had the ability to do so.   As noted above, plaintiffs' attempts to establish the lack of good faith fall woefully short of the mark and are insufficient.

Moreover, plaintiffs have not identified anything in the adjustment of Andrew's claim that even remotely raises a specter of self-dealing.  As aptly summarized by defendant:

> As the record shows, State Farm acted promptly and in good faith in opening, investigating, evaluating, valuing, and negotiating Plaintiffs' claim.  *See generally* SF. Indeed, Plaintiff and State Farm twice reached an agreement on the value of UIM claim, only for  Plaintiff to change course and later increase his demand.  SF at ¶¶ 19-20, 29-38. Yet, State Farm didn't scoff at him.  When Plaintiff came back with new information, State Farm re-opened, re-evaluated and continued to negotiate with Plaintiff in a prompt and reasonable manner.  SF at ¶¶ 21-28,  30-46.  This is despite Plaintiffs' repeated  refusal  for over  a  year  to participate  in an SUO, and resistance to providing authorizations for the release of medical records, both of which are investigative tools to which State Farm is contractually entitled.  SF at ¶¶ 4, 23-24, 26-27, 40, 42-43, 46-47.  Plaintiff also gave State Farm unreasonably small windows of time to respond to his demands, and refused to grant any extensions.  SF at ¶ 24.  Nevertheless, State Farm continued to work with Plaintiff and to explain to him what State Farm needed, why State Farm needed it, and the basis for State Farm's determinations regarding his claim.  SF at ¶¶ 25, 27, 33, 36, 42-44.   State Farm reasonably valued  Plaintiffs UIM claim at $50,000.00  ($65,000.00 gross when considering the BI credit), and reasonably took the position that, if Plaintiff did in fact undergo surgery, the claim could be again be re-evaluated at that time.
> This case presents nothing more than Plaintiffs simply disagreeing with State Farm's evaluation of the claim.

Defendant's Brief in Support (Doc. No. 32) at p. 14.  This summary is accurate and stands untarnished by plaintiffs' submissions in opposition to defendant's motion.  In other words, plaintiffs have failed to adduce sufficient evidence to question whether the course of conduct undertaken by State Farm in the adjustment and negotiation process was colored by the lack of

good faith.  And without such evidence plaintiffs have failed to identify a material issue of fact as to either element of a bad faith claim under 42 Pa. C. S. § 8371 in conjunction with adjusting Andrew's UIM claim.

In short, plaintiffs have failed to advance sufficient evidence to permit a finding in their favor on a bad faith insurance practices claim.  Plaintiffs' evidence pertaining to defendant's failure to uncover Burke's policy during a search for household policy holders in conjunction with Andrew's UIM claim cannot bear the weight plaintiffs seek to have it shoulder.  State Farm straightforwardly requested plaintiffs to identify the automobiles owed by any family member residing in their household.  They did not identify or even allude to Burke and his motor vehicle when so requested.  The evidence reflecting the address used in issuing Burke's policy has every appearance of being consistent with honoring the representations and billing requests of its insureds and does not in any event supply clear and convincing evidence that defendant engaged in self-dealing or other similar measures in order to thwart its good faith obligations in adjusting and negotiating Andrew's UIM claim.

Additionally, the record does not demonstrate that defendant acted "in complete disregard of a risk of harm to [plaintiff] which [was] known or should [have been] known to be highly probable and with a conscious indifference to the consequences."  Pennsylvania's Suggested Standard Jury Instructions, at 3.17.  There is no evidence whatsoever that defendant did not investigate, valuate and negotiate with plaintiffs in good faith or stopped doing so during the adjustment process.  Consequently, defendant is entitled to summary judgment on plaintiffs' bad faith insurance practices claim at count two.

For the reasons set forth above, defendant's motion for summary judgment on plaintiffs' bad faith insurance practices claim at count two will be granted.  An appropriate order will

Case 2:18-cv-00708-DSC   Document 45   Filed 11/30/20   Page 19 of 19

follow.

<u>Date: November 30, 2020</u>

<u>s/David Stewart Cercone</u>
David Stewart Cercone
Senior United States District Judge

cc:    Alexander J. Jamiolkowski, Esquire
       John J. Zagari, Esquire
       Daniel L. Rivetti, Esquire
       Jennifer L. Miller, Esquire
       Mark A. Martini, Esquire

       (*Via CM/ECF Electronic Mail*)

19